**E. I. M. CO., Inc. v. PHILADELPHIA GEAR WORKS, Inc.**

Civ. No. 5549.

United States District Court
S. D. Texas, Houston Division.
Dec. 26, 1951.

Berry, Richards & Baker, T. E. Richards, Jr., Browning & Simms, Ralph Browning and James B. Simms, Houston, Tex., for plaintiff.

McGregor & Sewell and Douglas W. McGregor, Houston, Tex., Henry N. Paul and Francis W. Sullivan, Philadelphia, Pa., for defendant.

HANNAY, District Judge.

This action is brought by E. I. M. Company, a Texas corporation, seeking a Declaratory Judgment of non-infringement and invalidity of patents Nos. 2,114,013; 2,150,813; 2,203,233; 2,222,699; 2,315,389; and 2,319,842, owned and controlled by the defendant, Philadelphia Gear Works, Inc., a Pennsylvania corporation. Plaintiff further asserts a cause of action for unfair competition based on defendant's alleged malicious threats of alleged patent infringement addressed to plaintiff's customers. Defendant has answered, denying plaintiff's allegations and praying for: (1) dismissal of the Complaint; (2) for final injunction against further infringement of certain Letters Patent owned and controlled by it; (3) for an accounting for profits and damages arising because of such infringement; (4) for assessment of costs, and (5) for such other and further relief to which it may be entitled.

By stipulations entered into between plaintiff and defendant on April 19, 1951, plaintiff has withdrawn its request for Declaratory Judgment with respect to all of the patents listed in the Complaint except the Ball patent No. 2,114,013, and defendant has acknowledged that plaintiff's valve controls, as shown and described in Joint Exhibits I, II, and III attached to such stipulations, do not infringe any claim of the patents listed in the Complaint, except Claim 2 of the Ball patent No. 2,114,013.

## Findings of Fact.

### Title and Constructive Notice.

1.

Defendant, Philadelphia Gear Works, Inc., is the owner by assignment, dated March 17, 1950, of United States Letters Patent 2,114,013 issued to Russell C. Ball, "together with all claims, demands and causes of action for the past infringement of said Letters Patent, wheresoever and by whomsoever committed."

(See assignment, Def's Ex. 34.)

2.

Defendant has attached to all valve controls made and sold by it, embodying the invention of the Ball patent in suit, a plate bearing the number of said patent.

(Def's Ex. 41: Testimony of Ball, Tr. p. 831.)

### Issue of Invention.

3.

Prior to his invention, Ball was confronted with a two-fold problem: (1) To provide a valve control capable of both manual and power operation and having adequate safeguards avoiding a coincidence of manual and power operation, thereby preventing the possibility of injury to an operator turning the handwheel and also preventing interference between manual and power operation; and (2) to provide in such a valve control a device whereby when the motor was started, as by remote control, the handwheel would be automatically released and the motor would be automatically engaged to actuate the valve spindle.

(Patent in suit, Pl's Ex. 117, page 1, col. 1, lines 1 to 31; Testimony of Panish, Tr. pp. 963-4.)

4.

The need for an improved valve control satisfying the above mentioned requirements had existed since the introduction of dual control valves, such as shown in the King Patent No. 705,250 of 1902. Numerous patents had issued in this field of inventive activity between 1902 and 1935, and

during this period various inventors, including Dean, Panish and Clinedinst, had made statements in patents or publications showing that they were aware of the problem and were seeking a satisfactory solution thereof. Their efforts to find a solution of one aspect of the problem (non-coincidental manual and power drive) invariably resulted in a sacrifice of the other aspect (automatic handwheel release and power drive engagement). Until Ball's invention, no satisfactory solution was found.

(King patent, Def's Ex. 66; Testimony of Panish, Tr. pp. 962–969, 973–976; see also Dean's Article, Def's Ex. 68, p. 16, Panish patent, Pl's Ex. 120, p. 3, lines 24–27, Clinedinst patent, Pl's Ex. 119, p. 1, col. 1, lines 36–52; old "Limitorque" operators designed by Dean, Def's Ex. 35, and Def's Ex. 59, p. 18.)

5.

The first successful solution of the twofold problem outlined above is found in the Ball patent.

(Deposition of Hertrich, Pl's Ex. 142, p. 51; Testimony of Panish, Tr. p. 965.)

6.

It was a novel concept on the part of Ball to provide, in a valve control capable of selective manual or power operation, a means whereby the impulse of the power-driven mechanism would serve, first, to release the hand operated drive and, secondly, to connect the motor operated drive.

(Testimony of Gignoux, Tr. pp. 568–569.)

7.

Clutch detent mechanism for maintaining or securing a clutch in handwheel engagement was, per se, old in the valve control art. Such mechanism is shown, for example, in the prior Panish patent No. 1,747,-594.

(Pl's Ex. 120, p. 2, line 11. 129–130, see also, detent 38a in Figure 3.)

8.

Ball, however, was the first to provide a clutch holding mechanism in combination with means for allowing the clutch to be released automatically from handwheel engagement by the impulse of the motor driven mechanism and thereafter shifted automatically into operative engagement with the power-driven mechanism. The novel combination of elements for achieving the new result is expressed in Claim 2 of the Ball patent.

(Testimony of Gignoux, Tr. p. 569; of Panish, Tr. pp. 1010–1.)

*Commercial Success.*

9.

The total sales of valve controls made and sold by defendant from 1936 to and through 1950, embodying the invention of the Ball patent in suit, has amounted to $8,264,011. Said valve controls have been sold to practically all of the water works, petroleum refineries, central stations, power plants, chemical engineering plants, paper making plants, steel manufacturing plants, pipe lines and other companies listed on pages 19–8 to 19–10 of defendant's Catalog L–50, and have been used in many foreign countries. One government installation involves between 2,500 and 3,000 of defendant's patented valve controls. The patented valve control has been highly successful and such success has been due in large measure to the merit of Ball's invention.

(Catalog L–50, Pl's Ex. 132, Testimony of Walker, Tr. pp. 613–617.)

*Issue of Anticipation by Prior Art.*

10.

Jones (British) Patent No. 307,444 does not disclose of the following elements called for in claim 2 of the Ball patent:

"a rotary member adapted to surround the spindle for axially moving the same when rotated" (red); or

"means responsive to the operation of the power-driven mechanism for automatically rendering effective", etc. (green).

(Pl's Ex. 122; Testimony of Gignoux, Tr. pp. 556–562; of Panish, Tr. p. 1015.)

11.

Jones (British) Patent No. 307,444 shows a friction clutch m 3 and centrifugal members m 10 "to ensure that before *. * *

the power operated means are connected, and the load applied to the electric motor the latter shall be free to rotate and speed-up." According to Jones' specification energization of solenoid S pulls down ends s4 of the lever s5 to disengage the hand-wheel H, and subsequently the weighted arms fly out and motor torque is transmitted through the gearing m7 and m8 to screw v1 to actuate the valve. Hence, in Jones' patent neither the release of the hand-operated driving means nor the operative engagement of the power-driven means are affected "in response to the operation of the power-driven mechanism," as called for in the claim in suit. On the contrary, such operations are responsive to the electrical impulse which energizes the solenoid S and are unrelated to the operation of the power-driven mechanism.

(Pl's Ex. 122, p. 2, lines 55–86; Testimony of Gignoux, Tr. pp. 561–2; of Panish, Tr. pp. 1015–1018).

### 12.

Jones (British) Patent No. 307,444, regardless of the type of valve V which may be operated by the control mechanism, neither discloses nor suggests the use of any rotary member adapted to surround a valve spindle for axially moving the same. To provide such rotary member in Jones would necessitate substantial reconstruction of the control mechanism. Furthermore, the use of a friction clutch, such as shown in the Jones patent, renders the device inoperative for opening large valves, which require a hammer blow to open, and the use of clutch jaws, such as shown in Jones, is impracticable, because of the difficulties of alignment of such jaws.

(Testimony of Gignoux, Tr. pp. 504, 557–8; of Panish, Tr. pp. 1018–1020.)

### 13.

Jones U. S. Patent No. 1,864,653 does not contain as full a disclosure as Jones British Patent, but the two devices operate in the same manner. The same deficiencies of disclosure, indicated above with respect to the British patent, apply also to the Jones United States Patent.

(Testimony of Gignoux, Tr. pp. 555–6; of Panish, Tr. p. 1023.)

### 14.

Panish Patent No. 1,747,594 shows a clutch mechanism 38 which is operated manually by means of a hand knob 41. It contains no automatic clutch shifting device. If the clutch is left in hand-operated position and the motor is started, the valve will not move. Panish does not disclose any of the following elements called for in claim 2 of the Ball patent: "means responsive to the operation of the power-driven mechanism for automatically rendering ineffective" etc. (green).

(Pl's Ex. 120; Testimony of Gignoux, Tr. p. 554; of Panish, Tr. pp. 1012–1014.)

### 15.

Haas Patent No. 1,850,392 relates to a machine tool, such as a grinding machine. It does not disclose any of the following elements called for in claim 2 of the Ball patent:

"a valve actuating spindle," etc. (brown);

"a rotary member adapted to surround the spindle" (red);

"a power-driven mechanism adapted for selective driving connection with said rotary member" (blue);

"clutch mechanism", etc. (orange); or

"means responsive to the operation of the power-driven mechanism for automatically rendering ineffective" etc. (green).

(Pl's Ex. 123; Testimony of Gignoux, Tr. p. 564; of Panish, Tr. pp. 1022–3.)

### 16.

Clinedinst Patent No. 1,996,365, although disclosing a device which is to some extent non-coincidental, uses a differential gearing and therefore fails to avoid interference between manual and power operation. As Clinedinst states in his specification: "Of course, by rotating the handwheel 61 with sufficient speed in the proper direction, the effect of the motor 60 can be entirely nullified," etc. Clinedinst does not disclose any of the following elements called for in claim 2 of the Ball patent:

"a clutch mechanism," etc. (orange); or

"means responsive to the operation of the power-driven mechanism for automatically rendering ineffective," etc. (green).

(Pl's Ex. 119, p. 3, col. 1, 11. 25–28; Testimony of Gignoux, Tr. pp. 567–568; of Panish, Tr. pp. 1025–1026.)

17.

Knight Patent No. 2,096,251 issued on October 19, 1937 on an application filed in the United States Patent Office on September 23, 1935. Prior to Knight's filing date, Russell C. Ball had conceived the invention of his patent in suit, had disclosed it to others and was diligently engaged in reducing it to practice. No proofs have been offered to show that Knight's date of invention was prior to that of Ball.

(Pl's Ex. 124; also Def's Exs. 38 (A to N), 51–52, 60–62.)

18.

Knight Patent No. 2,096,251 discloses a mechanism for opening and closing a door. The door 1 is normally power-driven, but the power drive 7 may be disconnected by pulling a hand chain 10. The door 1 closes by gravity. Operation of the manual drive defeats the power drive. Knight does not disclose any of the following elements called for in claim 2 of the Ball patent:

"a valve actuating spindle" (brown); or

"a rotary member * * * for axially moving the same when rotated" (red); or

"means responsive to the operation of the power-driven mechanism for automatically rendering ineffective" etc. (green).

(Pl's Ex. 124, particularly page 1, col. 1, 11. 5–14, page 2, col. 1, 11. 58–60, col. 2, 11. 11–20; Testimony of Panish, Tr. pp. 1021–2.)

19.

Schulte Patent No. 953,766 discloses a valve control device in which a handwheel 70 may be locked against rotation by means of a locking member 73. Schulte does not disclose any of the following elements called for in claim 2 of the Ball patent:

"a clutch mechanism" etc. (orange); or "means responsive to the operation of the power-driven mechanism for automatically rendering ineffective" etc. (green).

(Pl's Ex. 121; Testimony of Gignoux, Tr. pp. 565–6; of Panish, Tr. pp. 1024–5.)

20.

None of the prior art citations offered by plaintiff herein disclose power-driven mechanism, the impulse of which, first, releases a hand operated drive and, secondly, connects a motor operated drive.

(Testimony of Gignoux, Tr. p. 568.)

21.

There is no evidence of any use in this country of any of the prior patents relied upon by plaintiff, with the exception of the Panish patent. As to the Panish patent, the torque responsive switching feature, shown therein, has been extensively used, but the clutch mechanism, hand knob and other features represented in Fig. 2 at the left side thereof have never been used commercially. Accordingly, all of the prior art citations represent "paper" patents insofar as they disclose clutch shifting or other mechanisms for avoiding coincidental manual and power operation.

(Testimony of Panish, Tr. pp. 1014, 1031.)

*Issue of Inventorship.*

22.

Russell C. Ball conceived the invention of his patent No. 2,114,013 in December, 1934. He disclosed said invention to his patent attorney, Arthur Middleton, while Ball and Middleton were attending the Power Show held in New York City in December, 1934. Subsequently, Ball explained his invention to Ernest H. Granfelt and instructed the latter to complete the details of design and to prepare drawings illustrating the invention. Granfelt completed the first drawings of a valve control embodying the invention of the patent in suit on or about June 3, 1935, and June 5, 1935.

(Testimony of Ball, Tr. pp. 821–824; of Middleton, Tr. pp. 913–917; also drawings comprising Def's Ex. 51–56, and Deposition of Granfelt, pp. 12–20.)

23.

During July and August, 1935, Granfelt made numerous detailed drawings of the various parts of the valve control invented

by Ball. Shop orders were then issued for the construction of the first valve control. Work on said first valve control commenced in August, 1935 and was completed on or about October 23, 1935. The preparation of the drawings and the building of the first machine were carried out not only with diligence but with haste in a effort to rush the job to completion. Said first machine was tested on or about October 23, 1935, was found to be satisfactory, and served thereafter as a prototype for building of later machines. Sales of valve controls embodying the Ball invention commenced in February, 1936.

(Deposition of Ball, Tr. pp. 823–829; shop orders, Def's Exs. 38 A to N inclusive, also Exhibits 60–62; Deposition of Granfelt, Def's Ex. 25, pp. 53–55, 65.)

24.

Joseph Hertrich and his brother-in-law, William Grieselhuber, while in the employ of defendant, had worked on centrifugals which were then being made by defendant for Western States Machine Co. These men terminated their employment with Philadelphia Gear Works, Inc., on February 6, 1937 and August 27, 1937 respectively, and soon thereafter were employed by Western States Machine Co., which company then discontinued ordering centrifugals from defendant and began making such devices in its own plant.

(Deposition of Hertrich, Pl's Ex. 142, pp. 62–64; Deposition of Barber, Def's Ex. 25, pp. 197–198; Testimony of Ball, Tr. pp. 847–8.)

25.

Hertrich claims to have conceived the invention of the Ball patent in an effort to meet certain U. S. Navy specifications which allegedly called for a valve control in which the handwheel would not turn when the motor was operating. Until December 16, 1935, however, all U. S. Navy specifications involving value operators specified that the same were not to involve any declutch mechanism or clutch levers and further called for a detachable handwheel. All valve operators made by defendant for the Navy, prior to December 16, 1935, were provided with detachable handwheels in conformity with such specifications. No Navy specification, prior to December 16, 1935, called for a noncoincidental valve control or one in which the handwheel would not turn when the motor was operated.

(Deposition of Hertrich, Pl's Ex. 142, pp. 10–11; Testimony of Ball, Tr. pp. 838–843; Navy specifications and drawings, Def's Exs. 43 and 44.)

26.

Hertrich was unable to fix any definite date for his alleged invention. His final effort to establish such a date by relating it to an earlier dated drawing, Def's Ex. 300, placed his date of alleged invention in the summer of 1935. By that time, however, Benson and Dean, the persons to whom Hertrich allegedly disclosed his invention, had left the employ of defendant. Moreover, by that time Ball had disclosed his invention to Middleton and Granfelt and drawings thereof had been made.

(Deposition of Hertrich, Pl's Ex. 142, pp. 77–8, Def's Ex. 300; Testimony of Ball, Tr. pp. 843–5, Def's Exs. 51 and 52.)

27.

The proofs fail to establish any prior invention by Hertrich or any disclosure thereof to Ball, or the making of any description or model, or any actual or constructive reduction to practice of Hertrich's alleged invention.

(Deposition of Hertrich, Pl's Ex. 142, pp. 80–1; Testimony of Ball, Tr. pp. 838–845.)

28.

The sketch, Pl's Ex. 100, made by Benson during his depositions, contains no showing of a handwheel. If a handwheel were mounted on the output shaft 9 of this device, in the manner suggested in Benson's testimony, the handwheel would be revolved by the motor. As testified by Hertrich, the device shown in Benson's sketch, Pl's Ex. 100, was not a workable device. The alterations to this sketch made by Hertrich, with blue and red pencil marks, and shown on Pl's Ex. 110, represent a "hypothetical" conjecture on

Hertrich's part as to what "could have been shown on the original sketch which rich's own admission, contained in his letter attached to the end of his deposition, he had only a "hazy idea" that he had suggested this design, and as to what may have been shown" on this sketch. By Herthe allegedly made, but which has not been found. No device, similar to that shown on Pl's Ex. 100 or 110, was ever made.

(Deposition of Hertrich, Pl's Ex. 142, pp. 20-1, 90-92, and letter of April 13, 1951 attached to the end of his said deposition.)

29.

Hertrich's claim that he made the invention of the Ball patent is unsupported by any documentary evidence.

*Issue of Breadth or Functionality of Claim.*

30.

Claim 2 of the Ball patent sets forth in clear and understandable language the novel combination of manually operated and power-driven elements invented by Ball, their physical and functional relationship, and the manner in which they co-operate to produce the desired results, including the successive operations which are affected automatically in response to the operation of the power-driven elements. The novel concept constituting the gist or heart of the invention is expressed in claim 2 in terms of structure and function, including the co-operative relationship of the elements.

(Testimony of Gignoux, Tr. p. 569; of Panish, Tr. pp. 1010-1.)

*Issue of Disclaimer.*

31.

Claims 11, 12 and 13 of the Ball patent in suit (originally filed as claims 21, 22 and 23 of the Ball application) were allowed by the Patent Office over the prior art, particularly the patent to Smith & Hauser, on the following argument:

* * * "In other words, it is applicant's objective to design a self-contained power drive that is readily adaptable to existing valve equipment. * * * this novel adaptation requires no change of the valve construction, inasmuch as a fully encased drive unit is adaptable to and seats on to the top flange of the valve yoke in a compact, simple and otherwise efficient assembly, namely, as the existing nut member 42 becomes engaged by the otherwise self-contained drive unit thus mounted. In other words, the attachable power drive unit according to applicant has a recess in which it receives an exposed portion of the actuating nut member 42 to establish cooperative relationship therewith."

*  *  *  *  *  *

"In the construction of Smith & Hauser respectively, the rotatable nut member which actuates the valve spindle cannot be said to constitute a part of the existing valve and valve yoke construction in the sense of the standard valve construction considered by applicant, but in each of the cited instances the nut member is of a special construction substantially embodied in the drive unit itself, rather than in the valve yoke or else so closely entwined with the design thereof, that the criteria of a detachably self-contained power drive, such as applicant's, are lost."

The above argument applies with equal force and effect to the Clinedinst patent.

(File Wrapper of Ball Patent, Def's Ex. 4, p. 79; Testimony of Gignoux, Tr. pp. 537-540.)

32.

In the Clinedinst patent the power drive unit is not "attachable in a self-contained manner" to the yoke of the valve, nor does it embody an actuating nut "protruding axially and outwardly from the yoke top," nor does it embody a power-drive unit having "a recessed portion adapted to receive therein said protruding nut portion." The nut portion 30 of Clinedinst's rotary sleeve is located wholly within the housing 20. It is not an element of the valve but is an element of the housing. It does not protrude from the valve yoke 14. Furthermore, the housing 20 of Clinedinst is not attachable and removable as a unit. Various elements thereof must be disassembled when the housing is attached to or removed from the yoke.

(Pl's Ex. 119; Testimony of Gignoux, Tr. pp. 532–9; of Panish, Tr. pp. 1026–1030.)

### 33.

On or about March 12, 1937, prior to defendant's acquisition of the Clinedinst patent, defendant's patent attorney, Middleton, rendered an opinion to defendant advising the latter of the various distinctions, as set forth above, between the disclosure of the Clinedinst patent and the subject matter claimed in the Ball patent.

(See opinion rendered by Middleton, Def's Ex. 49, and testimony of Middleton, Tr. pp. 918–921.)

*Issue of Infringement.*

### 34.

Plaintiff, E. I. M. Company, Inc., prior to the institution of this suit and within six years of the filing of the complaint and counterclaim herein has manufactured and sold valve controls as illustrated in Joint Exhibits I and II. Said valve controls, their structure and mode of operation are described in a stipulation of counsel herein, dated April 19, 1951.

(Stipulation B, Def's Ex. 14; Complaint par. V.)

### 35.

Said valve controls made and sold by plaintiff embody every element set forth in claim 2 of the Ball patent. As testified by plaintiff's expert, Mr. Gignoux, plaintiff's valve controls embody every element specified in said claim 2 if the words "clutch detent mechanism * * * manually operated means" be assumed to cover "a means such as the power shifting unit which causes the clutch A42 to move into the handwheel operating position when the handwheel is turned," or if it be assumed that "there is a detent in there." As further testified by Mr. Gignoux the hydraulic mechanism of the E. I. M. valve controls does in fact maintain the clutch in handwheel operating position.

(Testimony of Gignoux, Tr. pp. 507–509, 511–512.)

### 36.

For all practical purposes the clutch of the E. I. M. structure is maintained and secured in active engagement with the manually operated means until it is released by the power-drive mechanism.

(Panish, Tr. pp. 995–998; of Gignoux Tr. pp. 511–512.)

### 37.

For all practical purposes the relief valve A–71 and check valve A–69 of the E. I. M. valve control serve as a clutch detent mechanism. They effectively hold the clutch under all conditions that are likely to be encountered and which would tend to dislodge the clutch from active engagement with the handwheel.

(Testimony of Panish, Tr. pp. 997–8, 1003–5; of Gignoux, Tr. p. 572.)

### 38.

In valve controls such as plaintiff's or defendant's the forces which tend to dislodge the clutch or cause it accidently to shift from handwheel engagement to motor drive engagement are relatively small and, therefore, it requires relatively little resistance to hold the clutch in handwheel engagement. No greater force is required to hold the clutch in hand operated position than is required to shift it.

(Testimony of Morrell, Tr. pp. 412–3; of Panish, Tr. p. 1007.)

### 39.

Plaintiff has experienced no difficulty, nor have any complaints been made by the users of its valve controls, with regard to any accidental or unintended shifting of the clutch.

(Testimony of Morrell, Tr. p. 410.)

### 40.

Insofar as the maintenance of the clutch in active handwheel engagement is concerned, plaintiff's valve controls possess all of the advantages of defendant's patented valve control.

(Testimony of Morrell, Tr. p. 402.)

**41.**

In plaintiff's valve controls the spring pressure of the relief valve A–71 "must offer a sufficient resistance to create pressure differential in the system which allows or permits the clutch to be shifted even when it is under load," and similarly this spring pressure offers "resistance at this point to a shifting of the clutch."

(Testimony of Morrell, Tr. pp. 419, 422.)

**42.**

In plaintiff's valve controls the elements represented in green on the court room chart (Joint Exhibit II) operate "to shift the clutch" and "to maintain it." When the motor is started these elements "effect the release of the hand operating means where they have been in engagement" and such starting of the motor "effects also the automatic operative engagement of the power driven means with the rotary member."

(Testimony of Morrell, Tr. p. 428.)

**43.**

In the valve control shown in the Ball patent the mechanism for holding and shifting the clutch 63 consists of a cam 73 mounted on a motor driven shaft 19 and associated mechanical elements (shown in green) which operate to restrain or move a forked lever 78. In plaintiff's valve control the mechanism for holding and shifting the clutch A–42 consists of a cam A–51 mounted on a motor driven shaft A–37 and associated mechanical and hydraulic elements (shown in green) which operate to restrain or move a forked lever A–39.

(Testimony of Morrell, Tr. pp. 426–7.)

**44.**

The hydraulic mechanism, including relief valve A–71 and check valve A–69, of plaintiff's valve control is the full equivalent of the clutch detent mechanism of the Ball patent, and of the spring detent 382 of the Panish patent. All of these devices effectively maintain and secure the clutch in active handwheel engagement until released.

(Testimony of Panish, Tr. pp. 998–1005; of Morrell, Tr. p. 415.)

**45.**

In the Ball patent the function of the specific "clutch detent mechanism" illustrated and described therein is variously stated as to "hold or release," to "lock or unlock," or to "maintain and secure." In the patent specification it is stated: "Preferably, the declutching device once it is engaged stays locked" etc., and further: "in the accompanying drawings, for the purpose of example there has been illustrated the best embodiment of the invention now known but such embodiment is to be regarded as typical only of many possible embodiments and the invention is not limited thereto.

(Pl's Ex. 117, p. 2, col. 1, 11. 38–40, 57–62, p. 4, 11. 3–7; compare also claims 1 and 2.)

**46.**

Prior to Ball's invention various hydraulic devices had been used in substitution for and as the equivalent of mechanical devices. For example, hydraulic jacks had been used in substitution for mechanical jacks, and hydraulic brakes for automobiles had been used in substitution for mechanical brakes.

(Testimony of Morrell, Tr. pp. 403–405; of Panish, Tr. p. 1009.)

**47.**

The word "detent" is variously defined in the dictionaries. In its broader sense it is defined as follows:

"a detainer or checking device;"

"something to check motion;"

"anything used to check or prevent motion or approach;"

"a stop or catch in a machine which checks or prevents motion and the removal of which brings some motor at once into action."

(Def's Exs. 6–10, 71.)

**48.**

Plaintiff's valve controls are interchangeable with defendant's valve controls. As to certain of its types of valve controls, plaintiff has adopted the same number of bolt holes, the same angle between bolt holes, the same size of bolt holes, threads, and other critical mounting dimensions as used by defendant. Plaintiff has also at times employed "the same Gardner Denver Air Motor" and an "identical gear train."

(Testimony of Morrell, Tr. pp. 431–36; Def's Ex. 31.)

*Issue of Unfair Competition.*

**49.**

The alleged acts of unfair competition on the part of defendant consist of:

(a) The bringing of a suit against Kerotest Manufacturing Co., Inc. for infringement of Ball Patent No. 2,114,013;

(b) A telephone conversation between Harry C. Bell and Russell C. Ball which was followed by an exchange of letters between Walworth Company and Philadelphia Gear Works (Pl's Exs. 5, 6 and 7) and

(c) Oral statements made by Howard Murray, Jr., to Raymond F. Heath.

(See Pl's Requested Findings of Fact Nos. 24–31 inclusive, submitted on May 31, 1951.)

**50.**

The suit of Philadelphia Gear Works, Inc. v. Kerotest Manufacturing Company, Inc., was filed on or about March 22, 1950 in the United States District Court for the Western District of Pennsylvania and is identified as Civil Action No. 8668. At the time of the filing of said suit, Philadelphia Gear Works had in its possession three drawings of the E. I. M. Company, Inc., showing the type of valve control then being offered for sale by E. I. M. Company, Inc., also a letter written by Nairn to Walker, dated March 13, 1950, together with a sketch describing and illustrating plaintiff's valve control and its mode of operation.

(Certified copy of proceedings in Kerotest case, Pl's Ex. 135; also Pl's Exs. 116, 125, 126 and 127; Testimony of Ball, Tr. pp. 58–65.)

**51.**

In the fall of 1949 plaintiff published and generally distributed an advertising bulletin describing its valve control. At the time of the filing of the above mentioned suit against Kerotest, there was nothing secret or confidential about said E. I. M. valve control. Its structural characteristics were then a matter of public property.

(Advertising Bulletin Def's Ex. 1; Testimony of Morrell, Tr. pp. 401–2, 432.)

**52.**

The telephone conversation between Bell and Ball, referred to above, took place after the filing of the instant suit and was initiated by Bell. The three letters, which followed this conversation, contain "the elements of all the questions of doubt" that existed in Bell's mind. Said letters, which are dated April 14, 26 and 29, 1950, respectively, show a willingness on the part of the Philadelphia Gear Works, Inc. to grant to Walworth Company, Inc. a license for the sale of fourteen E. I. M. units. Neither the telephone conversation nor the letters involve any threat going beyond enforcement of defendant's patent rights.

(Deposition of Bell pp. 26, 38–9, and Pl's Exs. 5, 6 and 7 attached thereto; Testimony of Ball, Tr. pp. 78–80.)

**53.**

The oral statements made by Howard Murray, Jr. to Raymond F. Heath in which Murray informed Heath of the pendency of the Kerotest suit were "more just gossip than anything else."

(Testimony of Heath, Tr. pp. 223–4.)

**54.**

The initials "E. I. M." in the name of plaintiff stand for Elliott, Ince and Morrell. Lynn T. Elliott and Leon Ince, copartners trading as Lynn Elliott Company, formerly acted as exclusive sales representatives of defendant in the State of Texas. For the term of their contract with defendant they agreed (paragraph 3) * * * "not to become interested for

any other person or concern in the handling or sale of products similar to those manufactured by the party of the First Part" (Philadelphia Gear Works, Inc.). Elliott and Ince, since the formation of E. I. M. Company, Inc., have been officers of that company. James N. Morrell was formerly a vice-president of Philadelphia Gear Works, Inc. Since the formation of E. I. M. Company, Inc., he has been the president of that company.

(Def's Ex. 303; Testimony of Morrell, Tr. pp. 759, 762; of Elliott, Tr. pp. 249, 257.)

### 55.

Morrell, while he was vice-president of Philadelphia Gear Works, Inc., deliberately caused said company to cancel its contract with Lynn Elliott Company.

(Deposition of Donze, Def's Ex. 20, pp. 44–6; of Walker, Tr. pp. 633–4; of Ball, Tr. p. 853.)

### 56.

Morrell, while he was vice-president of Philadelphia Gear Works, Inc., persuaded Benson to leave his employment with that company and to become a stockholder and employee of E. I. M. Company, Inc.

(Testimony of Morrell, Tr. pp. 810–11; Deposition of Benson, Def's Ex. 24x pp. 29–31.)

### 57.

Plaintiff, prior to September 1, 1949, caused to be cancelled certain orders placed by W. K. M. Company with defendant, said orders being cancelled August 30, 1949, well knowing that it was the intention of W. K. M. Company on August 30, 1949 that W. K. M. Company would thereafter place the identical cancelled orders with plaintiff, E. I. M. Company, Inc.

(Testimony of Sink, Tr. pp. 748–750; see also Def's Exs. 26a, b and c, 32 a, b, and c, and telegram of August 31, 1949, Def's Ex. 23.)

### 58.

Said cancelled orders were later placed by W. K. M. Company with plaintiff.

(Testimony of Sink, Tr. pp. 752–3; of Morrell, Tr. p. 812; Pl's Ex. 150, and Def's Ex. 26.)

### 59.

Although the orders thus cancelled and later placed with plaintiff bear on their face the typewritten date of September 21, 1949, Morrell testified that during the week of September 11, 1949, probably on the 14th, at a meeting with Gregory of W. K. M. Company at which Elliott was present: "I told them at that time we had the E. I. M. Company in process of formation." Morrell also told Gregory at that time that Ince was going to be in the company and Elliott advised Gregory that he (Elliott) was going to be in the E. I. M. Company. Morrell testified further, "I believe either Mr. Elliott or Mr. Ince made the arrangements (for the office of E. I. M. Company, Inc.) * * * I would say we moved into that office the week of September 11th."

(Testimony of Morrell, Tr. pp. 812–3; Def's Ex. 26.)

### 60.

During the period in which the foregoing events took place, Elliott and Ince were still under contract to give exclusive representation to the "handling or sale of products" of Philadelphia Gear Works, Inc. Although defendant offered to relieve Lynn Elliott Company of this obligation, when it sent a notice of cancellation of said contract, by suggesting its willingness to dispense with the thirty-day notice required, this offer was refused in a letter written by Elliott and dated September 6, 1949, which stated *inter alia:* "Our answer is that we will let the contracts expire a natural death September 15. Until that time we will continue to give you the best representation we possibly can."

(Def's Exs. 303, 45A.)

### 61.

Despite Walker's instructions to Morrell, when the W. K. M. orders referred to above were cancelled, that there should be a cancellation charge, Morrell instructed Losch to write the letter of September 1, 1949, Defendant's Exhibit 62, accepting the cancellation and limiting cancellation

charges, if any, to a possible charge on the motors.

(Deposition of Losch, Def's Ex. 25, pp. 178-9; Testimony of Walker, Tr. p. 644.)

62.

The officers of E. I. M. Company, Inc. appropriated for the use of that company, information and technical data acquired in confidence from defendant. They utilized such information and data in their approach to defendant's customers in an effort to line up said customers for themselves. For example, the letter from W. K. M. Company of September 16, 1949 to Trans-Arabian Pipeline Co., referring to the substitution of E. I. M. units reads * * * "we are arranging to furnish the same Gardner Denver Air Motor as originally considered and on identical gear train * * Mr. J. N. Morrell (former Chief Engineer of Philadelphia Gear Works) is personally working on this problem in Houston * * The improved units which we are furnishing to be manufactured by E. I. M. Company, Inc., 507 M. & M. Building, Houston, Texas, will have all mounting dimensions *identical* to the units originally proposed." (Def's Ex. 31; Testimony of Elliott, Tr. pp. 1194-8.)

63.

The orders placed with plaintiff by W. K. M. Company were for the same number of units for the same job and were described in the order by the name "Limitorque" the trade-mark of defendant.

(Testimony of Sink, Tr. pp. 752-3; Compare Def's Ex. 22a and Def's Ex. 32.)

Conclusions of Law.

1.

This court has jurisdiction of the parties and subject matter of this suit.

2.

In accordance with Stipulations A and B executed by the parties on April 19, 1951, plaintiff has withdrawn its request for declaratory judgment with respect to all patents listed in Paragraph VII of the Complaint except the Ball patent No. 2,114,013, and defendant has acknowledged that plaintiff's valve controls, as shown and described in Joint Exhibits I, II, and III attached to said stipulations, do not infringe any claim of said patents listed in the Complaint, except claim 2 of Ball patent No. 2,114,013.

3.

Defendant is the owner by assignment of Ball patent No. 2,114,013 and of all claims for damages for infringement thereof.

4.

Claim 2 of Ball patent No. 2,114,013 complies with the patent statutes, is unanticipated by the prior art, and is valid.

5.

Claim 2 of Ball patent No. 2,114,013 is entitled to a reasonable breadth of construction, including a range of equivalence commensurate with the novelty of the invention described in said patent.

6.

Claim 2 of Ball patent No. 2,114,013 expresses the novel concept constituting the gist of Ball's invention and such concept is set forth in terms of a combination of elements, and their co-operative physical and functional relationship.

7.

Russell C. Ball is the first inventor of the subject matter claimed in said Ball patent No. 2,114,013.

8.

Claims 11, 12 and 13 of Ball patent No. 2,114,013 are not in issue. These claims are presumptively valid, and no duty rests, or has rested upon defendant to disclaim the subject matter of said claims or any part thereof.

9.

Prior to and within six years of the filing of the Complaint and Counterclaim herein plaintiff has made and sold valve controls which infringe claim 2 of Ball patent No. 2,114,013.

**10.**

Defendant has not abused or misused its patent No. 2,114,013.

**11.**

Defendant has not committed any acts of unfair competition, as alleged in the Complaint.

**12.**

Plaintiff and its officers, Elliott, Ince and Morrell, come into Court with unclean hands and are not entitled to any equitable relief.

**13.**

The Complaint should be dismissed.

**14.**

Defendant is entitled to an injunction against further infringement of Ball patent No. 2,114,013, to an accounting for damages, and to an award of costs.